James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700

Michael E. Criden
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, Florida 33143
(305) 357-9000

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARBARA ZAMORA-VALDES, Individually and on Behalf of all Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| v. | |
| NOVARTIS CORPORATION; ALCON LABORATORIES, INC.; JOHNSON & JOHNSON; JOHNSON & JOHNSON VISION CARE, INC.; BAUSCH & LOMB, INC.; VALEANT PHARMACEUTICALS NORTH AMERICA LLC; COOPERVISION, INC.; and ABB/CON-CISE OPTICAL GROUP LLC, | **COMPLAINT and** **DEMAND FOR TRIAL BY JURY** |
| Defendants. | |

**TABLE OF CONTENTS**

I.     NATURE OF THE CASE ....................................................................................... 1

II.    PARTIES ............................................................................................................... 7

       A.    Plaintiff ..................................................................................................... 7

       B.    Defendants ................................................................................................. 7

             1.    Manufacturing Defendants............................................................. 7

                   a.    Alcon Defendants................................................................. 7

                   b.    Johnson & Johnson Defendants ...................................... 7

                   c.    Bausch+Lomb Defendants ................................................. 8

                   d.    CooperVision ...................................................................... 8

             2.    ABB ................................................................................................ 8

III.   AGENTS AND CO-CONSPIRATORS ................................................................. 9

IV.    JURISDICTION, VENUE, AND COMMERCE ................................................... 9

V.     CLASS ACTION ALLEGATIONS ..................................................................... 10

VI.    FACTUAL ALLEGATIONS ................................................................................ 12

       A.    Relevant Market....................................................................................... 12

       B.    Market Power............................................................................................ 14

       C.    Retail Distribution.................................................................................... 15

             1.    Types of Retail Channels ............................................................. 15

             2.    Pricing In Retail Channels .......................................................... 16

       D.    Prior Efforts by Manufacturers and Independent ECPs to Reduce Price
             Competition For Contact Lenses ............................................................ 19

       E.    Implementation of the RPM Agreements through so-called "UPPs"................. 21

             1.    Actions By Manufacturer Defendants ....................................... 21

             2.    Role of ABB and Independent ECPs in Developing and Agreeing to RPM
                   Policies....................................................................................... 26

             3.    The Manufacturer Defendants Jointly Agreed to Implement RPM Policies
                   ................................................................................................... 34

                   a.    Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing
                         Policies ............................................................................ 34

                   b.    Industry Structure Conducive to Collusion................................ 35

                   c.    Motive to Conspire, Including Assurances That Competitors Will
                         Also Act ........................................................................... 35

                   d.    Opportunities to Conspire ............................................... 35

                   e.    Acts Contrary to Economic Self-Interest..................................... 36

|  | f. | Information Exchanges ................................................................ 37 |
|  | g. | ABB's and ECPs' Conduct ........................................................... 39 |
|  | h. | Past Conspiratorial Conduct ....................................................... 40 |

VII.   HARM TO COMPETITION .......................................................... 40

VIII.  CLAIMS FOR RELIEF .................................................................. 44

COUNT ONE: Per Se Violation of the Sherman Antitrust Act: Horizontal Price Fixing 44

COUNT TWO: Rule of Reason Violation of the Sherman Antitrust Act: Resale Price Maintenance ............................................................... 46

COUNT THREE: Per Se Violation of the New Jersey Antitrust Act: Horizontal Price Fixing ............................................................. 49

COUNT FOUR: Violation of the New Jersey Antitrust Act: Resale Price Maintenance  49

COUNT FIVE: Violation of the New Jersey Consumer Fraud Act ................................. 50

COUNT SIX: Unjust Enrichment .................................................... 52

IX.   PRAYER FOR RELIEF .................................................................. 53

X.    JURY TRIAL DEMAND .................................................................. 55

Plaintiff Barbara Zamora-Valdes, individually and on behalf of a class of all those similarly situated ("Class"), complains against Defendants, and, upon personal knowledge as to herself, and information and belief and investigation of counsel as to all other allegations, alleges as follows:

## I.    NATURE OF THE CASE

1.    Plaintiff brings this Class Action under Rule 23 of the Federal Rules of Civil Procedure individually and on behalf of a Class consisting of all persons and entities in the United States who purchased disposable contact lenses ("contact lenses") manufactured by Alcon Laboratories, Inc. ("Alcon"), Johnson & Johnson Vision Care, Inc. ("J&J"), Bausch + Lomb, Inc. ("B&L"), and Cooper Vision, Inc. ("CV") (collectively, with their respective affiliated companies identified herein, the "Manufacturer Defendants") subject to a so-called "Unilateral Pricing Policy" ("UPP") as described herein from June 1, 2013, to the present.

2.    The Manufacturer Defendants conspired with each other and with Defendant ABB Optical Group ("ABB"), a wholesaler, as well as independent eye care professionals ("ECPs") represented by ABB, to eliminate price competition—including from "big box" retail stores, discount buying clubs, and online retailers—by agreeing to enter into, and entering into, per se illegal and unreasonable minimum resale price maintenance ("RPM") agreements.  As ECPs themselves have acknowledged, this new pricing scheme represents a "fundamental shift" in how contact lenses are sold to consumers.

3.    Although Defendants euphemistically and deceptively label their RPM agreements as Unilateral Pricing Policies, the RPM agreements were in fact the product of agreements and understandings among Defendants with the intent and effect of raising retail prices and eliminating interbrand, intrabrand, and intertype competition.  Defendants have

entered into sales agreements with retailers whereby they will not sell contact lenses to them unless they agree to maintain the price above mandated levels.

4.      The Manufacturer Defendants also have expressed concern about the deep discounts offered by online retailers, because they saw price-bargaining power shifting away from manufacturers towards big buyers. These concerns were reportedly exacerbated after Luxottica, the world's largest glasses and sunglasses manufacturer, agreed to purchase 1-800 Contacts in 2014.  ABB, which is the largest distributor of contact lenses in the United States and which services more than two-thirds of ECPs, shares the Manufacturer Defendants' goal of increasing retail prices.  ECPs, which have traditionally sold contact lenses at prices much higher than those offered by big box stores, buying clubs, and internet-based retailers, similarly sought to limit such price competition.

5.      Competition in the market for contact lenses in the United States is distorted by the unique role played by ECPs. Unlike prescription drugs, which are prescribed by doctors but sold only by pharmacies, ECPs both prescribe and sell contact lenses.  When an ECP writes a prescription for a patient, that ECP prescribes not only the type and power of the lenses, but also the particular brand.  Unless the patient comes back for another eye exam, or switches ECPs, he or she is locked into buying the prescribed brand of lenses for the length of the prescription, typically from one to two years.

6.      The power to prescribe makes ECPs the gatekeepers of the disposable contact lens market.  ECPs have the power and the economic incentive to prescribe lenses that provide them the largest profit margins.  Contact lens manufacturers understand these incentives all too well. ECPs will refuse to prescribe a manufacturer's lenses if their profit margins are undercut by more efficient retailers such as mail order and internet companies, or big box stores. As a result,

2

contact lens manufacturers have always done what they can to insulate ECPs from price competition.  The economic purpose of the UPPs is to insulate ECPs from price competition from more efficient distributors and retailers.

7.      Defendant ABB also plays an important role in the industry.  As its website states, "ABB OPTICAL GROUP is the nation's largest distributor of soft contact lenses.  We supply more than two-thirds of Eye Care Professionals in America with brand name contact lenses; high grade ophthalmic and fully customizable Gas Permeable Lenses."  ABB sells primarily to Independent ECPs as opposed to ECPs employed by chain optical stores such as LensCrafters.  Independent ECPs charge the highest average prices for contact lenses compared to any other channel of distribution.

8.      ABB's unique role in the industry is buttressed by its focus on raising ECPs' profit margins.  Angel Alvarez, ABB's CEO, says ABB is "helping them manage that [contact lens] portion of their business. . . . We take very seriously the trust that they have."  His stated goal is to help ECPs grow their practices and "make more money."

9.      ABB is not merely a wholesale vendor.  It regularly surveys its ECP customers to find out how much they are charging their patients for each different type and brand of contact lenses.  ABB then publishes the results of the surveys in its periodic Retail Price Matrix publication so that ECPs can make sure their prices are as high as their fellow practitioners.  In its Profit Advisor newsletter, ABB also advises its ECP customers to charge as much as possible for contact lenses, beyond the UPP floor set by the Manufacturer Defendants.  As the biggest customer of the manufacturer defendants, ABB acts as an agent for its 19,000 Independent ECP customers.  UPPs benefit ABB by forcing more consumers to purchase replacement contact lenses from the Independent ECPs who are ABB's customers.

3

10.     To accomplish their shared goals, the Manufacturer Defendants, ABB, and the Independent ECPs jointly agreed to alter the pricing model.  Before June of 2013, each of the Manufacturer Defendants permitted distributors and retailers to determine the prices at which they would sell their contact lenses and did not preclude discounting of such products.  Now, each of the Manufacturer Defendants prohibits retailers from selling certain lines of contact lenses below mandated prices.  This change in the pricing model would not have occurred in the absence of a conspiracy among the Defendants.  Contact lenses are the only prescription medical device sold in the United States pursuant to a UPP.

11.     As part of this conspiracy, ABB worked with the Manufacturer Defendants to develop UPPs for several of the most advanced and most popular lines of contact lenses sold by the Manufacturer Defendants.  Over the course of 15 months commencing in June of 2013, each Manufacturer Defendant implemented this strategy in the form of an RPM scheme that it called a "UPP."

12.     Under this RPM scheme, each Manufacturer Defendant promulgated a minimum retail price for its affected product(s) and threatened to curtail the supply of some of its contact lens lines to retailers who sell below the mandated price.  Alcon was the first to do so in June of 2013 and expanded the number of contact lenses subject to the policy to four lines in succeeding months.  B&L followed suit with respect to one of its major contact lens product lines in February of 2014.  J&J took a similar step with respect to at least eight of its contact lens product lines in June of 2014.  And CV followed suit in September of 2014 with respect to one of its contact lens lines.

13.     On July 30, 2014, the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Judiciary Committee of United States Senate held a hearing to

4

investigate the practices at issue here ("Senate Hearing").  In testimony it was estimated that the RPM agreements implemented by Alcon, J&J, and B&L encompassed 40% of the domestic contact lens market and that the Manufacturer Defendants would extend their UPPs to cover 80% of the market by the end of 2015.

14.     Despite the name given to the RPM agreements by the Manufacturer Defendants, and contrary to statements by the Manufacturer Defendants' executives, those agreements are not "unilateral" pricing policies.  Instead, the Manufacturer Defendants agreed to limit retail price competition only after extensive consultation with Independent ECPs and their agent, the ABB. Whatever they want to call it, the violation here is an unlawful agreement:  the manufacturer agrees to sell contact lenses only on the condition that they only be resold above mandated levels. Following implementation, the Manufacturer Defendants have enforced the RPM agreements through actual retaliation, as well as threats, warnings, and other communications that ensure compliance with the agreements.

15.     The RPM agreements were intended to eliminate discounting by big box, internet, and warehouse club store retailers of contact lenses, thereby decreasing their ability to compete with Independent ECPs who also sell contact lenses.  The RPM agreements have had the desired effect, as reflected in statements by Independent ECPs, ABB, and big box, warehouse club, and internet retailers.

16.     Thus, for example, Jim Murphy, Vice-President of Alcon, described Alcon's RPM agreements in a public podcast as, inter alia, "a win" for the manufacturers and the doctors. Independent ECPs have enthusiastically endorsed the RPM agreements.  As Gary Gerber, one influential Independent ECP put it; the agreements guarantee doctors "a margin they have not seen for 20 years."   Likewise, ABB has also touted the RPM agreements; its CEO, Angel

Alvarez, called them one of the best developments of the last 20 years, because they help ECPs raise profit margins.

17.     The RPM agreements (and the reference to their accomplishing the highest margins for ECPs in 20 years) have to be viewed in the context of successful prior industry efforts to suppress price competition for contact lenses.

18.     More than two decades ago, contact lens manufacturers conspired with ECPs to restrict the supply of contact lenses to alternative sources of distribution (e.g., mail-order houses). In 1996, 32 state attorneys general and consumers brought antitrust lawsuits against J&J, B&L, CIBA Vision ("CIBA") (Alcon's predecessor), and the AOA to curtail these practices. The cases eventually settled and the challenged practices were discontinued.

19.     More recently, in 2009, the German Federal Cartel Office levied a fine of €11.5 million against CIBA for fixing minimum resale prices of contact lenses and restricting internet and wholesale prices of its contact lenses. CIBA was found to have utilized an internal "price maintenance" program whereby it enforced minimum resale prices for contact lens in violation of European Community and German law.

20.     Last year, Manufacturer Defendants J&J and B&L were fined by China's National Development and Reform Commission ("NDRC") for violating China's Anti-Monopoly Law. In May of 2014, J&J was fined 3.6 million Yuan and B&L was fined 3.7 million Yuan for adopting UPPs and requiring retailers to adhere to RPM agreements, among other practices.

21.     RPM agreements represent merely the latest effort by the Manufacturer Defendants and independent ECPs to ensure that discounting of contact lenses does not occur. The victims, as in 1996, are the tens of millions of consumers who buy contact lenses.

6

22.     Defendants' per se illegal and unreasonable horizontal and vertical agreements to restrain trade and overt acts taken in furtherance thereof are in violation of federal and state antitrust laws.   Defendants' continuing conspiracy to restrain trade has caused Plaintiff and members of the class to pay millions of dollars more for contact lenses than they otherwise would have paid, and will continue to cause them to do so, if allowed to continue.

## II.     PARTIES

### A.     Plaintiff

23.     Plaintiff Barbara Zamora-Valdes ("Plaintiff") is a resident of the State of Florida. During the Class Period, Plaintiff purchased disposable contact lenses, which were subject to "UPP" RPM agreements, and which were manufactured by a Defendant.

### B.     Defendants

#### 1.     Manufacturing Defendants

##### a.     Alcon Defendants

24.     Defendant NOVARTIS CORPORATION ("Novartis") is a Delaware corporation headquartered in New Jersey at One South Ridgedale Avenue, East Hanover, NJ.  Alcon is the largest division within Novartis.

25.     Defendant ALCON LABORATORIES, INC. ("Alcon") is a Delaware corporation located at 6201 South Freeway Fort Worth, TX 76134.  Alcon is the largest division within Novartis.

26.     Alcon and Novartis are referred to herein collectively as Alcon.

##### b.     Johnson & Johnson Defendants

27.     Defendant JOHNSON & JOHNSON ("J&J") is headquartered in New Jersey at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.  J&J wholly owns J&Jv.

28.     Defendant JOHNSON & JOHNSON VISION CARE, INC. ("J&Jv") is a Florida corporation located at 7500 Centurion Parkway, Jacksonville, FL 32256.  J&Jv is wholly owned by J&J.

29.     J&J and J&Jv are referred to herein collectively as J&J.

### c.     **Bausch+Lomb Defendants**

30.     Defendant BAUSCH & LOMB, INC. ("B&L") is a Delaware corporation with its "Global Headquarters" located at in New Jersey at 400 Somerset Corporate Blvd. Bridgewater, NJ 08807.  B&L is owned by, and shares the same location with, Valeant.

31.     Defendant VALEANT PHARMACEUTICALS NORTH AMERICA LLC ("Valeant") is a Delaware limited liability corporation located at 400 Somerset Corporate Blvd., Bridgewater, NJ 08807.  Valeant owns, and shares the same location with, B&L.

32.     B&L and Valeant are referred to herein collectively as B&L.

### d.     **CooperVision**

33.     Defendant COOPERVISION, INC. ("CV") is a New York corporation located at 370 Woodcliff Drive, Suite 200, Fairport, NY 14450.

### 2.     **ABB**

34.     Defendant ABB/CON-CISE OPTICAL GROUP LLC ("ABB") is a Delaware limited liability company located at 12301 NW 39th Street, Coral Springs, FL 33065.  ABB states on its website that it "is the nation's largest distributor of soft contact lenses," and that it "suppl[ies] more than two-thirds of [ECPs] in America with brand name contact lenses, high grade ophthalmic and fully customizable Gas Permeable Lenses."  ABB wholesales the contact lenses sold by the Manufacturer Defendants and services over 19,000 ECPs nationwide.

8

## III.    AGENTS AND CO-CONSPIRATORS

35.    Each Defendant acted as the principal, agent, or joint venture of, or for, other defendants with respect to the acts, violations, and conduct alleged by Plaintiff.

36.    Various persons and/or firms not named as defendants herein participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

37.    Whenever reference is made to any act, deed, or transaction of any corporation or partnership, the allegation means that the corporation or partnership engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, representatives, parent, predecessors, or successors-in-interest while they were actually engaged in the management, direction, control, or transaction of business or affairs or affairs of the corporation or partnership.

38.    Plaintiff reserves the right to name some or all agents and co-conspirators as Defendants at a later date.

## IV.    JURISDICTION, VENUE, AND COMMERCE

39.    This Court has federal question subject matter jurisdiction pursuant to 15 U.S.C. §§ 1-2, & 15, and 28 U.S.C. §§ 1331 & 1337.

40.    This Court has supplemental subject matter jurisdiction under 28 U.S.C. §1367.

41.    This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy exceeding $75,000, exclusive of interests and costs.

42.    This Court has CAFA subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from Defendants.  In addition, more than

two-thirds of the members of the class reside in states other than the state in which the Defendants are citizens and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

43.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) & 22 and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

44.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on, the interstate commerce of the United States, including in this District. During the Class Period, each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce, including interstate railroads, highways, waterways, wires, wireless spectrum, and the U.S. mail, to join or effectuate their conspiracy.

## V.     CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action on their own behalf and as a class action under Rules 23(a) & (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

46.     All persons and entities who purchased disposable contact lenses manufactured by Alcon, J&J, B&L, or CV from June 1, 2013 to the present (the "Class Period"), where the prices for such contact lenses were set pursuant to a Resale Price Maintenance agreement as described herein.

47.     Excluded from the Class are government entities, Defendants, their co-conspirators, Defendants' subsidiaries, corporate affiliates, and counsel in this action.  Also excluded are the Judge presiding over this action, the Judge's law clerks, the Judge's spouse, and

any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

48.     The Class numbers in at least the thousands, the exact number and identities of the members being known by Defendants.

49.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

50.     There are questions of law and fact common to the members of the Class.  These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof.

51.     The questions include, but are not limited to:

    a.     Whether Defendants engaged in horizontal restraints of trade;

    b.     Whether Defendants engaged in RPM agreements;

    c.     Whether and the extent to which Plaintiff and members of the Class have been injured and damaged as a result of Defendants' violations of law;

    d.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

52.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

53.     Each Plaintiff is a member of the Class.  Plaintiff's claims are typical of the claims of other members of the Class, and she will fairly and adequately protect the interests of

the members of the Class.  Her interests are aligned with, and not antagonistic to, those of the other members of the Class.

54.     Plaintiff is represented by counsel competent and experienced in complex class action antitrust litigation.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such as are asserted in this Complaint.

56.     This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VI.   FACTUAL ALLEGATIONS

### A.   Relevant Market

57.     For purposes of this complaint, the term "contact lenses" refers to disposable contact lenses.  Such lenses, which were introduced to the market in 1987, are the most popular contact lens style in the United States and account for approximately 90% of contact lenses sold in the United States.  Depending on the contact lens line, these contact lenses are replaced either on a daily, weekly, or monthly basis.  Daily contact lenses are designed to be worn for a single day.  Weekly contact lenses are designed to be replaced on a weekly basis.  Monthly contact lenses are designed to be replaced every one to three months.  Contact lenses include both spherical lenses, which contain a single refractive power, and specialty lenses, which are crafted to address specific vision conditions such as toric lenses (for people diagnosed with astigmatism), and bifocal and multifocal contact lenses (for people diagnosed with presbyopia).  As Mr. Murphy of Alcon admitted in the podcast referenced above, contact lenses are a commoditized product.

12

58. The United States Food and Drug Administration ("FDA") first approved soft contact lenses in 1971. Disposable contact lenses are a soft contact lens. Since that time, contact lenses have been treated as Class II and Class III pharmaceutical devices that require a prescription from an ECP to purchase. The first generation of contact lenses required significant work on the part of an ECP to fit the lens, and as a result, most consumers purchased their contact lenses directly from their ECP. However, as contact lens technology improved, consumers were able to unbundle the purchase of their lenses from their eye exams because, in the words of a 2005 report by the FTC entitled The Strength of Competition In The Sale of Rx Contact Lenses: An FTC Study (the "2005 FTC Report"), "the replacement lens a consumer purchases pursuant to a prescription that specifies a brand will be identical, regardless of where it is purchased." However, to make it more difficult for patients to shop for replacement lenses, ECPs often refused to hand over a copy of their patient's prescription.

59. That situation changed with the December 6, 2003 enactment of the Fairness to Contact Lens Consumers Act ("FCLCA") (15 U.S.C. §§ 7601, et seq.), which requires ECPs to provide patients copies of their contact lens prescriptions automatically so that they can purchase their contact lenses from a retailer other than their ECP. Section 4(f) of the FCLCA (15 U.S.C. § 7603(f)) also barred sellers from altering a contact lens prescription. The legislative history of the FCLCA made it clear that the legislation was intended to "promote[] competition, consumer choice, and lower prices by extending to contact lens wearers the same automatic right to copies of their own prescriptions and allows consumers to purchase contact lenses from the provider of their choice."

60. In 2004, the FTC issued the Contact Lens Rule (16 C.F.R. Parts 315 and 456), which spells out the FCLCA's requirements. That rule reaffirms that ECPs must give a copy of

13

the contact lens prescription to the patient at the end of every contact lens fitting—even if the patient does not request it.  It contains other requirements that are intended to make it easier for the patient to take his or her prescription to an alternative source in order to reap the benefits of competition.  As the FTC has stated, the FCLCA "increases consumers' ability to shop around when buying contact lenses."

**B.     Market Power**

61.     The Manufacturer Defendants are the four major contact lens manufacturers in the United States.

62.     According to testimony given by R. Joe Zeidner, the former General Counsel of 1-800-Contacts, at the Senate Hearing, the four Manufacturer Defendants collectively control 97% of the United States contact lens market, J&J controls 35.3% of the market, Alcon controls 30.6% of the market, B&L controls 7.2% of the market, and CV controls 23.9% of the market. As discussed below, all have implemented RPM agreements with respect to some of their contact lens product lines.

63.     The contact lens manufacturing industry has grown even more concentrated in recent years, as large pharmaceutical companies have acquired contact lens manufacturers.  For example, in 2011, Novartis acquired Alcon, for roughly $12.9 billion.  Similarly, Valent entered this industry through its $8.7 billion acquisition of B&L in August 2013. And in August 2014, CV acquired Sauflon Pharmaceuticals Limited.

64.     New entry is not likely to displace this concentration.  Barriers to entry, including manufacturing and development costs, as well as regulation by the FDA and states, are high. Apart from the four Manufacturer Defendants, other manufacturers in this market are small and specialize in niche products or contact lenses for specific eye disorders.  Profits in the industry

14

have been estimated at 10.1%, with the Manufacturer Defendants enjoying the highest levels of profitability.

65.    For purposes of the allegations of this Complaint, the relevant product market is the market for soft (disposable) contact lenses and the relevant geographic market is the United States, given that contact lenses sold in this market are packaged specifically for such sales.  This is the market analyzed in the 2005 FTC Report and in its 2004 report entitled Possible Anticompetitive Barriers To E-Commerce: Contact Lenses (the "2004 FTC Report").

### C.    Retail Distribution

#### 1.    Types of Retail Channels

66.    Today, consumers with a prescription from an ECP can purchase their contact lenses from a variety of sources, including independent ECPs, national optical chains (e.g., LensCrafters), mass merchandisers (e.g., Wal-Mart and Target), wholesale clubs (e.g., Costco), and online retailers (e.g., 1-800-Contacts and LensDiscounts.com).

67.    Cumulatively, thirty-five million Americans spend roughly $4.2 billion per year on contact lenses in these various retail channels.

68.    The 2005 FTC Report presented data from both Ocular Sciences, Inc. ("OSI") and 1- 800-Contacts on the share of filled prescriptions and sales for contact lenses through these various retail channels:

### OSI Data

| Channel | Share of Patient Visits | Estimated Share of Filled Prescriptions |
|---|---|---|
| Independent M.D. | 14.1% | 12.3% |
| Independent O.D. | 52.6% | 45.8% |
| Independent Stores and OD Groups | 12.2% | 10.6% |

| Channel | Share of Patient Visits | Estimated Share of Filled Prescriptions |
|---|---|---|
| Chain Retailers and Optical Stores | 21.0% | 18.4% |
| Mail Order/Internet | N/A | 13.0% |

**1-800-Contacts Data**

| Channel | Share of Sales |
|---|---|
| Independent M.D. | 4.3% |
| Independent O.D. | 64.3% |
| Mass Merchandisers | 13.0% |
| Retail Chains | 9.5% |
| Mail Order/Internet | 8.0% |

69.     The FTC concluded that both sets of data told the same story: "Manufacturers distribute the largest share of lenses through independent ECPs and the smallest through the online/mail-order channel."

70.     A more recent industry survey has estimated that retail chains' and mass merchandisers' share of contact lens sales will reach 20.5% on 2015, while online retailers' share will reach 9.2%.

### 2.     Pricing In Retail Channels

71.     Multiple studies conducted prior to implementation of the RPM agreements found that contact lenses were cheaper when purchased online or from big-box stores as opposed to independent ECPs.

72.     As noted in the 2004 FTC Report, a 1998 study found that the average price of a six-lens pack of contact lenses was roughly 19 percent more expensive when purchased from an independent ECP instead of from one of the other categories of retailers.

73. The 2004 FTC Report also presented a March 2004 study by 1-800-Contacts reflecting similar results:

**1-800-Contacts Study**

| | Channel | Focus Toric (CIBA) | FreshLook Colorblends (CIBA) | Acuvue 2 (J&J) |
|---|---|---|---|---|
| ECPs | Optical Retail Chains | $66.69 | $42.09 | $22.85 |
| | Independent Optometrists | $70.91 | $46.67 | $24.39 |
| | Ophthalmologists | $73.18 | $46.54 | $25.74 |
| | **ECP Average** | **$70.26** | **$45.10** | **$24.33** |
| Non-ECPs | Mass Merchandisers | $53.21 | $35.40 | $18.05 |
| | 1-800-Contacts | $59.00 | $34.95 | $19.95 |
| | **Non-ECP Average** | **$56.11** | **$35.18** | **$19.00** |
| **Average Price Difference** | | **$14.16** | **$9.93** | **$5.33** |
| **Average Percent (%) Difference** | | **+25.2%** | **+28.2%** | **+28.0%** |

74. In the 2005 FTC Report, the FTC examined the prices of a six-month supply of ten different contact lenses from 20 online retailers (including four hybrid retailers, or retailers with both an online and offline presence) and from 14 offline retailers in Northern Virginia. It found that contact lenses are, on average, "$15.48 less expensive online than offline" and that "[w]holesale clubs . . . [were] the least expensive channel overall, offering prices that averaged around $30 less than independent ECPs, around $9 less than all online outlets, and about $6 less than pure online retailers."

**FTC Study**

| | Channel | Average Price of All Lenses |
|---|---|---|
| Non-ECPs | Pure Online | $87.77 |
| | Hybrid | $106.38 |

17

|  | Wholesale Club | $83.18 |
|---|---|---|
|  | Mass Merchandiser | $108.38 |
|  | **Non-ECP Average** | **$96.43** |
| ECPs | Optical Chain | $109.20 |
|  | Independent ECP | $112.35 |
|  | **ECP Average** | **$110.78** |
| **Average Price Difference** |  | **$14.34** |
| **Average Percent (%) Difference** |  | **+14.9%** |

75.     Based in part on this study, the FTC concluded that the FCLCA's provision requiring ECPs to provide the patient with a prescription that the patient can then use elsewhere had increased competition and reduced contact lens prices across the country.

76.     The significant price disparities between ECP pricing and mass merchandiser and on-line retailers (and resulting savings for the consumer) continued until the Defendants imposed RPM policies.

77.     In addition to the actual pricing differences that existed prior to the RPM agreements, purchasing contact lenses from a brick-and-mortar retailer also imposes a time cost that is not present in purchases from online retailers.   In a 2002 study presented to the Connecticut Department of Public Health, the FTC calculated that an hour-long trip to a brick-and-mortar retailer had "an implicit time cost of between $10.96 and $26.00," which was "a markup of between 50 and 130 percent over the cost of a multipack."

78.     As stated in a July 2014 Reuters article, "'[t]he online channel is beginning to garner considerable attention from [ECPs]. Many are seeing this channel as a threat to traditional stores,' said Euromonitor.  'The pricing strategies on the Internet usually mean a much cheaper price than that found in physical stores.'"

18

D.    **Prior Efforts by Manufacturers and Independent ECPs to Reduce Price Competition For Contact Lenses**

79.    Because of the price competition engendered by the mass merchandisers and internet retailers, ECPs and contact lens manufacturers have repeatedly attempted to limit their impact.  In 1996, in the First Contact Lens Litigation, consumers and 32 state AGs filed antitrust lawsuits against J&J, B&L, CIBA, and the AOA.  These lawsuits alleged that the contact lens manufacturers and the AOA (the independent ECPs' trade association) "conspired among themselves . . . to restrict the supply of replacement contact lenses to alternative channels of distribution."  Specifically, the plaintiffs alleged a classic group boycott: that the manufacturers and the AOA restricted wholesale sales to "alternative suppliers" (e.g., mail order houses and pharmacies), and that but-for this conspiracy, the plaintiffs would have paid lower prices for contact lenses.

80.    In concluding that the plaintiffs had "proffered ample evidence" to overcome summary judgment, the district court pointed to the following pieces of evidence, among others:

- "A Vistakon [(now J&J]] memo discussing the agenda for the AOA/Vistakon meeting that took place January 15, 1992 stating, inter alia, 'reduc[ing] the possible trend away from prescribing Acuvue/Surevue as a result of patients' [sic] buying lenses from outlets other then [sic] their own practitioner.'"

- "A deposition excerpt wherein Vistakon's Consumer Products Director was asked why Vistakon changed its policy, stated 'We couldn't sell our products and doctors were saying to sales reps, 'I am losing patients; therefore, I don't want to put any more new patients in Acuvue because they will walk out of my door.'"

- "A memo written by Vistakon's D.R. Yadon, given to Vistakon sales personnel which is entitled 'Vistakon Gets Tough on Diverters,' discussing a 'joint effort between the manufacturers and professional organizations to address this [diversion] problem.'"

- "A Memo written by Craig Scott, Vistakon's Vice President for Marketing to Phillip Keefer discussing 'our action plan' regarding patient retention. . . . The stated objectives were to assist ECPs in retaining patients and to maintain ECPs' 'positive attitude toward fitting new patients with Vistakon products.' The two strategies listed to further those ends were to reduce the supply and the demand

19

for diverted products. The memo went on to discuss, inter alia, disguising the prescription from the patient and also discussed obtaining AOA feedback on the aforementioned proposals."

81.     After the district court denied summary judgment, and following several weeks of trial, the parties settled.  B&L paid $8 million into the settlement fund, offered a benefit package valued at $121 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis.  J&J paid $25 million into the settlement fund, offered a benefit package valued at $100 to the class members, and agreed to sell its contact lenses to the alternative channels of distribution on a non-discriminatory basis.  AOA paid $750,000 into the settlement fund, agreed to not restrict where consumers could obtain their replacement contact lenses, and agreed not to oppose the release of contact lens prescriptions. AOA also agreed not to make claims that eye health was impacted by the retail channel from which the contact lens was purchased.

82.     While this settlement resolved the issues as to the discriminatory practices of J&J, B&L, and Alcon's predecessor, other manufacturers continued to engage in these practices.  On September 15, 2006, the Commerce, Trade and Consumer Protection Subcommittee of the House Energy and Commerce Committee held a hearing entitled Contact Lens Sales: Is Market Regulation the Prescription?  Subsequently, the manufacturer most visibly engaged in restrictive distribution policies abandoned the practice, effectively making the need for the legislation moot.

83.     As explained above, two of the Manufacturer Defendants—J&J and B&L—were fined by the FCO in 2009 and China's competition authority in 2014 for mandating minimum retail prices in violation of, respectively, European Community and German law and China's Anti-Monopoly Law. According to the NDRC, the manufacturers used punitive measures, including fines and warnings, to ensure that retailers abided by the minimum price restraints.

84.     Independent ECPs and the ABB have engaged in other practices to limit retail price competition.   For example, before the Manufacturer Defendants implemented RPM agreements, ABB not only facilitated the exchange of retail price information among ECPs, but also urged ECPs to adopt uniform pricing.   ABB publishes a quarterly pricing survey, called the Retail Price Monitor, which calculates average prices for the biggest-selling contact lens lines. The survey relies on the prices of more than 450 practices.   The Retail Price Monitor "makes it easy" for ECPs to set contact lens prices and "maximize contact lens margins[.]"   ABB also operates yourlens.com, which independent ECPs can use to order contact lenses online, and which provides suggested retail prices.   As stated in ABB's promotional materials, "Yourlens.com takes the guesswork out of setting your online prices by utilizing our Retail Price Monitor suggested prices."

E.     **Implementation of the RPM Agreements through so-called "UPPs"**

1.     **Actions By Manufacturer Defendants**

85.     Alcon was the first of the Manufacturer Defendants to announce an RPM policy. Although Alcon initially announced an RPM policy for a single product line, today, Alcon has RPM policies on four of its contact lens brands.   In June of 2013, Alcon implemented its first RPM policy for its DAILIES TOTAL1® contact lenses.   In January of 2014, Alcon extended its policy to other lines of contact lenses: DAILIES® AquaComfort Plus® Multifocal and DAILIES® AquaComfort Plus® Toric contact lenses.   And in June of 2014, Alcon extended its RPM policy to AIR OPTIX® COLORS contact lenses.   Alcon has sought the written consent of ECPs to its UPPs.   According to one optometrist who wrote on "ODs on Facebook," an Alcon representative "made a special appointment with me to discuss UPP and to have me sign paperwork indicating that I understood and agreed to the policy."   Another ECP on the same website confirmed that this was Alcon's standard practice.

86.     In February of 2014, B&L implemented an RPM policy for its ULTRA™ line of contact lenses.

87.     In June of 2014, J&J announced RPM policies for all of its major contact lens lines. At the same time, J&J announced that it would discontinue contact lens lines that would not be subject to a UPP. The contact lens lines subject to an RPM policy are as follows: 1-Day ACUVUE® MOIST®, 1-DAY ACUVUE® MOIST® for ASTIGMATISM, 1-Day ACUVUE® TruEye®, ACUVUE® OASYS® with HYDRACLEAR®, ACUVUE® OASYS® for ASTIGMATISM, and ACUVUE® OASYS® for PRESBYOPIA. These policies became effective on July 1, 2014 for a six-month supply of ACUVUE® OASYS® with HYDRACLEAR® and on August 1, 2014 for the remaining contact lens lines.

88.     According to J&J, its RPM policies will impact roughly 9.66 million consumers, or 69% of the 14 million consumers of J&J contact lenses.

89.     Laura Angelini, President of J&J, announced J&J's policy in a written communication to ECPs on June 24, 2014.  A trade article described the announcement as follows: Last week, in a letter addressed to [ECPs] dated June 24, 2014, Laura Angelini, president, Johnson & Johnson Vision Care – North America, announced the company's launch of its "Enterprise Strategy" and "roadmap for the future," part of which includes resetting the price of specific contact lens products in the U.S. according to a new "unilateral pricing policy." Now, all wholesale customers will receive the same pricing for certain existing contact lenses already offered in the company's portfolio, Angelini told VMail.  The policy applies to the company's number one reusable, Acuvue Oasys, its number one disposable, Acuvue Moist, and its 1-Day Acuvue TruEye, which Angelini described as the company's "strategic brands."  The new policy also sets minimum retail pricing, which has been communicated to all its customers.

In addition, manufacturer's rebates have been eliminated by building those discounts into the retail price of these legacy products rather than requiring customers to send in proof of purchase to obtain rebates.  Angelini described this new pricing as a "holistic multifaceted pricing policy to refocus the conversation between the doctor and the patient on eye health and product performance rather than price.  This gives the optometrist the ability to improve his or her capture rate in the office," she told VMail.  "Now the patient has no incentive to shop around."  The letter to [ECPs] described the three areas in which the company would "demonstrate support for the profession and the professional—Prescribers, Portfolio and Preferred Partners."  Also in June of 2014, J&J announced that it would discontinue certain sub-brands of ACUVUE® ADVANCE®, a product line not subject to RPM policies, on August 1, 2014, and would eliminate the other non-RPM lines on March 31, 2015.  A policy letter prepared by J&J and disseminated to its customers made it clear that "[b]ecause an advertisement to beat any price logically commits a reseller to beat even a price that already is below the UPP Price, [J&J] will regard an advertisement promising to beat any price or using similar words to be an advertisement to sell for less than UPP Price."

90.     In September of 2014, CV became the last major contact lens manufacturer to implement a RPM policy.  CV implemented an RPM policy with respect to its Clariti contact lens line, which it acquired through its purchase of Sauflon, another contact lens manufacturer, for $1.2 billion in August of 2014.  In January of 2014, Sauflon had instituted a UPP on the Clariti line, and CV decided to maintain the UPP after it purchased Sauflon.

91.     Under the RPM policies, contact lens retailers are not allowed to offer discounts on these lines where the discounted price would be below the RPM policy price.  As Dr. Millicent Knight, head of Professional Affairs for J&J, said at the Senate Hearing, "[r]etailers

maintain the right to offer store coupons, rebates or promotions (discounts) under the ACCUVUE Unilateral Pricing Policy, provided that the final net price for the product covered by the UPP remains at or above the UPP Minimum Retail Price, after discounts are applied."

92.     RPM policies are enforced by the Manufacturer Defendants' threats to cut off supply to retailers that refuse to observe minimum price levels and through other coercive means. As Knight also explained to the United States Senate, Johnson & Johnson Vision Care, Inc. has three separate processes for proactive Market Price monitoring.  First, there are internal resources (J&J employees) dedicated to researching, confirming and notifying sellers of UPP violations.  In addition, Johnson & Johnson Vision Care, Inc. has retained two (2) independent firms to assist in monitoring Market Prices.  The first of these firms monitors all on-line pricing and advertising, the second conducts in-store price validations nationwide.  All customer types, regardless of size, geography, distribution method, etc., are included in one or more of these monitoring efforts.  If a customer is found to be in violation of the UPP, then Johnson & Johnson Vision Care, Inc. will no longer sell products subject to the policy to that customer.

93.     J&J expanded on its enforcement measures in a November 5, 2014 circular sent to its customers about its UPPs. That circular stated "[i]f you sell product below the UPP price, [J&J] and its authorized distributors [such as ABB] will refuse to accept new orders from you. In addition, [J&J] will exercise its right to repurchase your current inventory of products subject to the UPP price."

94.     In a prepared statement presented at the Senate Hearing, Alcon made a similar point.  As a result of this situation, Alcon chose to create an environment in which ECPs might more likely spend time learning about the new technology and explaining it to patients, all while having the opportunity to make a reasonable profit margin.  It did so by adopting its Unilateral

Pricing Policy, or UPP, when it launched DAILIES TOTAL1® in 2013.  That policy provided that Alcon would not supply DAILIES TOTAL1® to customers who resold it for less than the price announced by Alcon.

95.    B&L made a similar point in announcing its UPP: each customer is free to advertise or charge whatever price it wants, but should understand that Bausch + Lomb will cease to supply, and will prohibit its authorized distributors from supplying, Bausch + Lomb Ultra® contact lenses to any customer that resells or advertises Bausch + Lomb Ultra® contact lenses to the end consumer (e.g., patient) for sale at less than the MRP.

96.    The Manufacturer Defendants actually carry out these threats as to the contact lens lines where the ECP or retailer sells below the UPP.  In an article that appeared in the Review of Cornea And Contact Lenses in June of 2014, Gerber stated that "Manufacturers employing UPP have the ability to 'cut off' a doctor who does not abide by their pricing policy. Some practitioners question the ability and willingness of manufacturers to enforce these rules. To date, I'm aware of several instances where a manufacturer with a UPP has prohibited an online vendor from selling below the UPP. The hope is that all manufacturers with UPP lenses will follow suit, should other resellers not play by the rules."

97.    Similarly, Alvarez of ABB has stated publicly that the Manufacturer Defendants are very serious about policing their respective UPPs and that he knew firsthand that some ECPs had been given a "warning" for violating them.  He said manufacturers are "holding the gun" and are willing to lose business in order to police their UPPs.  Similarly, Murphy of Alcon confirmed that it warns violators that they are selling below the RPM and gives them an opportunity to cure. After a third-party auditor confirms a violation, the retailer is communicated with and "asked to make a correction" within five days.  Only if the violator refuses to increase its price does Alcon

punish the violation by prospectively denying access to the product for up to one year.  The clear implication of Alcon's warning system is that a retailer who has sold contact lenses below the RPM can regain access to the product by agreeing to abide by the RPM.

98.     Alvarez has indicated that "Unilateral Pricing Policy will bring a Fundamental Shift to the optical industry", calling them a "business-focused industry shift that many manufacturers have implemented."

### 2.     Role of ABB and Independent ECPs in Developing and Agreeing to RPM Policies

99.     Independent ECPs colluded with the Manufacturer Defendants in developing the RPM agreements.  Independent ECPs did this in order to increase profit margins, combat price discounts from online retailers and big box stores, and eventually, eliminate competition at the retail level altogether.  Once that competition is eliminated, independent ECPs will be able to charge whatever price they desire for contact lenses, as the UPPs are a minimum rather than a maximum resale price.  The Manufacturer Defendants agreed to collude with independent ECPs because a prescription from an ECP is required for the Manufacturer Defendants to sell their contact lens lines.

100.    Robert Atkinson, President of Information Technology and Innovation Foundation, testified at length on the collusion with ECPs at the Senate Hearing (footnotes omitted): "But how do optometrists convey this desire to prescribe UPP lens to producers? . . . In the case of the eye care industry, the collusion may not be in a smoke-filled room, but it's collusion all the same.  In this case, it's professional collusion through norms that is leading producers to adopt UPP policies.  In the optometry profession these anticompetitive social norms are expressed in a variety of means, particularly in articles in professional journals and on social

media channels that send a clear message to optometrists that they should prescribe doctors'-only lenses."

101.    For example, in an article in Review of Cornea and Contact Lens, Gary Gerber, OD, writes: "One of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away. While this may create friction with buying groups, the benefits outweigh any ancillary issues. More importantly, however, it forces practices to focus on something other than price to keep prescriptions in their office—if all 'retailers' sell the lenses for the same price, the method and environment under which they are sold will be the factors that determine where a patient decides to purchase their lenses."

102.    He added, "Manufacturers also benefit from UPP because retail price erosion can be stopped.  With a 'race to the bottom' from aggressive price cutting eliminated, motivations to fit a particular lens increase; this has the ability to support and protect brand equity. . . . All things being clinically equal (which of course they rarely are), savvy practitioners will give serious thought to prescribing UPP lenses.  For example, if you have a patient with astigmatism and they can wear a UPP lens, and a non-UPP lens is clinically equivalent, a smart doctor will choose the UPP option."

103.    Finally, he states what is obvious to everyone in the industry:  "Finally, the actual price mandated by UPP has so far been higher than lenses that do not have a UPP.  This has afforded higher profit margins and created a new sense of excitement surrounding contact lenses."

104.    Likewise, in an article in Review of Optometric Business, Paul Karpecki, OD, FAAO writes in favor of UPP, stating "One other exciting development: Independent practice

27

optometry becomes reinvigorated with contact lens prescribing as a profitable specialty and practice differentiator."

105.    Similar statements were posted on optometrist social media sites.   On the Facebook site "ODs on Facebook," a post from a person listed as Steve Silberberg (who lists himself as "ODwire.org supporting member") on the topic "J&J goes to universal pricing," wrote: "No more rebates etc. and 1-800 etc. goes away if they all follow B&L Alcon and now J & J. Cooper next."  In other words, under the RPMs agreements, competitors like 1-800 Contacts that sell for less will go out of business.

106.    Another ODwire.org supporting member listed as Stephen McDaniel wrote in response to J&J adopting UPP pricing: "Wow, great news.  Now I might actually fit more of their lenses.  Hopefully Cooper gets on board with this soon."

107.    Another member, listed as Joe DiGiorgio, OD, wrote: "I think I'll tell my patients that the onliner must have been selling counterfeit contacts.  Why else would they suddenly raise their prices to what I'm selling them."

108.    And they expressed this collective desire in meetings with industry representatives.  For example, in the Facebook OD site, a person listed as Kerry Kordet Giedd wrote, "At the Ultra launch last week with 300+ ODs from around the country present there was a Huge applause (honestly, it was quite an overwhelming response) when B&L (Bausch and Lomb) announced the UPP.  Without a doubt they were largely pleasing their OD base when they followed Alcon's lead on the UPP. . . . I think B&L will gain far more than they lose in practitioner [sic] loyalty and support of this policy."  Zeidner of 1-800-Contacts gave similar testimony at the Senate Hearing.

109.    ECPs have consistently spoken out in support of the RPM agreements, touting their benefits both to ECPs and to the Manufacturer Defendants.   Some of these ECPs are actually employed by the Manufacturer Defendants.   Barry Eiden, OD, for example, told an audience at the Global Contact Lens Forum that the new pricing policies represented "one of the monumental changes in contact lenses in my career."   Eiden is employed as a consultant for Manufacturer Defendants Alcon, B&L, and CV.   He is also an Independent ECP and the past Chair of the Contact Lens and Cornea Section of the AOA.

110.    Other Independent ECPs paid by the Manufacturer Defendants have also lent support to the new pricing policies.   For example, Giedd, who is referenced in Atkinson's testimony at the Senate Hearing, pledged her support in industry publications at the same time that she was being paid as a consultant by Alcon and CV.   Similarly, David L. Kading, OD, who consults for Alcon, stated that the new pricing policies are "fantastic" because they set "an even playing field and it also does not support companies who want to price cut their products in an effort to increase utilization."   Kading further stated that "[a]s a doctor, it allows me to let patients know they won't find the lenses cheaper anywhere else."

111.    ECP support for the RPM policies is widespread and hardly limited to spokespersons paid by the Manufacturer Defendants.   Other ECPs and their agents and trade associations—including ABB, the AOA and state-level optometric associations—have enthusiastically endorsed and supported the RPM agreements, recognizing that they signal an end to retail price competition for contact lenses.   A poll on Healio.com/Optometry posted after the Senate Hearing queried ECPs regarding the concept of the RPM policies and, of 204 respondents, 85% said they supported them.   Another poll, conducted by ABB, similarly found

high approval by ECPs of the RPM policies. According to Alvarez, 82% of the hundreds of doctors surveyed support them.

112.    The AOA has also been highly supportive of the Defendant Manufacturers' use of RPM agreements.  Indeed, David Cockrell, President of the AOA, testified in support of the Manufacturer Defendants' actions at the Senate Hearing, and the AOA submitted written comments in support of those actions.  AOA and state associations of optometrists have also been active in opposing legislative efforts in certain states to condemn the Defendant Manufacturers' use of RPMs.

113.    J&J publicly acknowledged the role that ECPs played in its formulation of a UPP. Angelini said that J&J was motivated to implement its RPM policy based on feedback received from ECPs regarding price erosion.  In the June 24, 2014 letter addressed to ECPs that is mentioned above, Angelini explained: When I last communicated with you about six months ago, I shared that Johnson & Johnson Vision Care, Inc., North America (JJVC), was in the process of carefully assessing our overall strategy so that we could best meet the needs of our customers, and asked for your feedback on what we were doing well and areas where we could improve.  Thanks to your open and candid responses, we were able to define our strategy and implement the changes and actions you told us were needed. . . . You, the [ECP] who prescribes our products, have our unwavering support for your clinical, business, and patient needs. . . . To further demonstrate our commitment to prescribers, beginning this week, many of you will begin to hear from your JJVC Sales Representative about our new pricing strategy within the United States. This includes a Unilateral Pricing Policy (UPP) . . . . We believe the multifaceted nature of this new pricing strategy and the variety of elements that comprise the program will allow you to refocus the critical doctor/patient conversation on eye health and product performance, rather

30

than cost.  Also, by removing the complexity of rebates and building these savings into our new pricing, we believe we will be able to reach more patients with instant savings, while providing a simpler approach for everyone."

114.     In a follow-up letter sent by Angelini to ECPs on or about December 17, 2014, she confirmed that J&J had extended an invitation to ECPs a year previously to "share your thoughts" on how J&J "could build and enhance our partnerships to help you meet the evolving needs of your patients and practices. Since then, your open and candid feedback was instrumental in helping us create Our Enterprise Strategy," which included the "new pricing strategy" of J&J's RPM policy.  Angelini welcomed continued feedback from ECPs, promising that they "can reach me and my leadership team at any time . . . ."

115.     Robert Ferrigno, President North America for CV, made a similar point in connection with CV's adoption of an RPM policy on one of its product lines, saying his company held twelve focus groups and met with 100 ECPs before acting.

116.     One ECP on Gerber's September 13, 2014 "Power Hour" podcast noted that Manufacturer Defendants' representatives actively counsel ECPs on how to sell contact lenses under the RPM policies.  He stated, "you don't have to push the annual supply, because it doesn't matter—they [the parties] are going to spend the same amount of money, whether they do it in six month increments or two month increments."  As the ECP explained, "[s]o, they kind of encourage you to get one box out of each eye and go from there."  J&J has also been willing to negotiate the particulars of how large customers implement its RPM policies, as reflected in the complaint filed in the Costco action.

31

117.   ECPs have also been instrumental in helping to police the use of UPPs. The website "ODs on Facebook", for example, gives instances of ECPs informing Alcon's sales representatives about potential violations and requesting them to take action.

118.   ABB played a principal role on behalf of ECPs to cause the Manufacturer Defendants to develop and implement the RPMs. As early as February of 2013—before any of the Manufacturer defendants had instituted UPPs—Alvarez stated publicly that ABB's focus was to be "aligned with manufacturers." A subsequent press statement by Alvarez confirmed ABB's integral role in developing the RPMs: "ABB has been working closely with manufacturers to develop [RPM schemes], which we believe enable a better overall patient experience by supporting competitiveness of prescribing practitioners[.]" "Contact lens fitters have always been and will always be a focus of our organization. We do everything possible to help them succeed."

119.   ABB also issues publications that allow Independent ECPs (and the Manufacturer Defendants) to monitor the pricing of contact lenses in order to ensure that prices set pursuant to RPM agreements are being followed. It publishes a quarterly Retail Price Monitor that facilitates this goal. ABB describes this publication as follows on its website: "[t]he ABB OPTICAL GROUP Retail Price Monitor provides [Independent ECPs] with the retail pricing structure of brand name lenses charged by private practitioners and leading online retailers. . . . The Retail Price Monitor is a benefit to ECPs looking to consolidate purchasing and maximize margins." As Alvarez stated in a press release issued in August of 2014, "[o]ur Q3 Retail Price Monitor that will be mailed with our Profit Advisor newsletter will show ECP's that they can continue to have a retail strategy by promoting annual supplies and staying within the limits of UPP."

120.    As one ECP put it, "[o]ne of the biggest benefits to practitioners of UPP is that it instantly creates a perfectly level playing field; volume discounts for large practices and online retailers go away."  This same commentator also agreed that the Manufacturer Defendants "also benefit from UPP because retail price erosion can be stopped."

121.    The 2014 third quarter issue of the ABB publication Profit Advisor, which was sent to Independent ECPs across the country, stated that the RPM policies were one of the first "business-focused shifts" in the industry.  It went on to advise Independent ECPs to charge more than the UPP: "You know that competitors around the corner or the country cannot sell their contact lens for less than UPP.  ECPs are staying in line, too, because the manufacturers are watching them.  Sellers who choose to ignore UPP policy run the risk of being unable to purchase lenses from the manufacturer.  Remember that UPP specifies the lowest price at which a particular lens can be sold.  Can you sell it for more? Indeed, yes, and I encourage you to do so. Increase your price by several dollars—and continue using the best strategy of explaining to your patients and customers that although they may be paying a few dollars more per box, they are receiving the various benefits that you offer.  See the Soft Lens Retail Price Matrix for a suggested retail pricing strategy on the UPP products.  In fact, I encourage you to adopt a policy of saying that you'll match any legitimate price on these contact lenses.  You already know what the price is; it's the UPP price.  It won't hurt your bottom line to match the UPP for annual supplies and for the very small percentage of customers who call on you to do so.  And I expect that the vast majority of your customers will respond to your value proposition and pay your retail price.  Most patients aren't looking for the absolute rock-bottom price. . . . As a result of UPP, I believe that the prescribing practitioner will be able to obtain a higher percentage of patient revenue."

122.    Alvarez repeated his advice that Independent ECPs charge their customers more than the RPM price in a September 13, 2014 broadcast of the "Power Hour" radio hosted by Gerber, saying that ECPs should try to reach a gross profit margin of 48%-49%.   Gerber concurred, saying that ECPs "should be charging more [than the RPM] because they can."

123.    Thus, ABB and its cohorts viewed the Manufacturer Defendants' RPM agreements as an occasion to gouge consumers even more for the price of contact lenses than would have been possible prior to the implementation of those agreements, with the hope that many consumers would not even realize they were paying a surcharge on the price mandated by UPPs that was duplicative of the service fees that they were already paying.   And ABB collected data in its Retail Price Matrix that facilitated the ability of Independent ECPs to engage in such systematic price increases.

### 3.    The Manufacturer Defendants Jointly Agreed to Implement RPM Policies

124.    Collectively facing pressure from Independent ECPs and ABB about competitive threats posed by the big box stores, on-line retailers, and club stores, the Manufacturer Defendants agreed with one another and with ABB and the Independent ECPs to impose RPM policies on their most advanced and most popular contact lenses lines.

125.    There is substantial evidence showing that the Manufacturer Defendants agreed with ABB and ECPs to enter into RPM agreements.   There is also substantial evidence showing that the Manufacturer Defendants agreed with one another to enter into RPM agreements. That evidence includes the following.

### a.    Abrupt, Near-Contemporaneous and Fundamental Shift in Pricing Policies

126.    Before June of 2013, none of the Manufacturer Defendants restricted the minimum retail price of its contact lenses.   After Alcon imposed the first RPM policy in June of

2013, all of its competitors followed suit within 15 months.  As Alvarez of ABB, put it, the RPM policies represent a "Fundamental Shift" in the contact lens market.  As noted above, contact lenses are the only prescription medical device sold in the United States pursuant to an RPM policy.

**b.**     **Industry Structure Conducive to Collusion**

127.     The four Manufacturer Defendants control 97% of the market for contact lenses. As noted above, the contact lens industry is a mature one with high barriers to entry that involves a commoditized product.

**c.**     **Motive to Conspire, Including Assurances That Competitors Will Also Act**

128.     Each of the Manufacturer Defendants had a motive to maintain high retail prices for its contact lenses.  They were concerned that low retail prices would put pressure on them to lower wholesale prices.  In addition, in order to encourage Independent ECPs to prescribe their contact lenses, the Manufacturer Defendants needed to keep the retail prices high.  ABB, which (a) is the largest distributor of contact lenses in the United States; (b) sells the Manufacturer Defendants' contact lenses to two-thirds of ECPs; and (c) has stated publicly that it "worked with" the Manufacturer Defendants to develop and implement the RPMs, was in a position to act as the "hub" in a "hub-and-spoke" conspiracy.  That is, ABB was in a position to communicate to each Manufacturer Defendant before it implemented an RPM that its competitors also intended to do so.

**d.**     **Opportunities to Conspire**

129.     Some Manufacturer Defendants were members of the Contact Lens Manufacturers' Association ("CLMA") and were the only members of the Contact Lens Institute ("CLI"), the activities of which are described below.  As members of this Association, the

Manufacturer Defendants had regular opportunities to meet, exchange information, and signal intentions to one another.  The CLMA hosts an annual meeting, publishes bi-weekly presidential updates to its members, and regularly publishes a newsletter.

### e.  Acts Contrary to Economic Self-Interest

130.    The acts of the Manufacturer Defendants in adopting RPM policies were contrary to each one's independent economic self-interest.

131.    In a analyst presentation made on September 11, 2014, CV admitted the "Potential Downsides/Challenges" of adopting RPM policies included: (a) "Enforcement can be challenging"; (b) "Consumer activism may generate legislative backlash and negative public perceptions"; and (c) "May alienate larger customers who want greater pricing freedom and cross marketing."  Yet only days later, it adopted an RPM agreement on its new flagship Clariti line of contact lenses.

132.    The other Manufacturer Defendants faced similar adverse impacts, as reflected in the events of 2014 and early 2015, which included complaints to the FTC, the Senate Hearing, a publicly-revealed investigation by the New York AG into Alcon's adoption of RPM policies, negative consumer backlash and proposed legislation in various state legislatures.  Despite these reasons not to implement RPM policies, all four Manufacturer Defendants proceeded to do so.

133.    Further demonstrating that the Manufacturer Defendants implemented RPM policies contrary to their individual economic self-interest, ABB's Alvarez has said publicly that the Manufacturer Defendants are willing to lose business in order to enforce their RPM policies.

134.    The Manufacturer Defendants have tried to justify their conduct by claiming that consumers could be injured by buying contact lenses from shoddy retailers who provide low-quality service.  That purported justification is pretextual—a fact that also supports an inference of conspiratorial conduct.  As a February 18, 2015 article in the Salt Lake Tribune noted, when

the Chairman of the Utah Senate Business & Labor Committee questioned an industry lobbyist on this purported justification at a legislative hearing held on February 17, the latter "could not provide an example of that ever occurring."  Indeed, Carol Alexander, a Director of Professional Affairs at J&J, stated during this hearing that she could not identify a single instance where a patient was harmed or placed at risk because he or she was able to buy contact lenses from a source other than optometrists.  Alexander admitted that the adoption of RPM policy by J&J was not motivated by concerns about patient risk or harm.  Similarly, Costco has explained that J&J "asserts this change [adoption of an RPM policy] is for the benefit of patients—we totally disagree."

135.    The allegations of the complaint filed in the Costco action further support this assertion.  It was thus contrary to the economic self-interest of any one of the Manufacturer Defendants to attempt to implement an RPM policy without assurance that its competitors would follow suit.  The discounters referred to above collectively possessed sufficient buying power in the contact lens market that no Manufacturer Defendant would be willing to forego those sales or alienate those customers by acting alone.  If only some of the Manufacturer Defendants had adopted RPM policies, discounters such as Costco or Wal-Mart could have shifted market share to those manufacturers that did not dictate a minimum retail price.  In fact, after all of the Manufacturer Defendants except for CV had implemented RPM policies, Costco sent a letter to its customers informing them of the other Manufacturer Defendants' RPM policies and urging them to switch to CV, only to see CV soon thereafter implement an RPM policy on its flagship Clariti line.

### f.    <u>Information Exchanges</u>

136.    The exchange among competitors of competitively sensitive, non-public information can be indicative of a price-fixing conspiracy and this conduct itself can violate the

antitrust laws.  Such exchanges occurred in the context of the CLI.  CLI has no members other than the Manufacturer Defendants.  Its board of directors consists of one executive from each of the Manufacturer Defendants.  CLI's Chair is Angelini of J&J.  Its Vice-Chair is Andrew Sedgwick, Vice-President of Global Commercial Strategy & Business Development for CV.  Its Treasurer is Richard Weisbarth, Vice-President of Professional Affairs for Alcon.  Its Director is Joseph Barr, Vice-President of Clinical and Medical Affairs for B&L.  Contemporaneously with the Manufacturer Defendants' adoption of UPPs, the CLI "newly created" a committee "to develop a collaborative approach by the member companies to help inspire ECPs and their staff to proactively pursue opportunities to fit CLs [contact lenses] and appropriately follow up so that their patients and practice will benefit."

137.   The CLI's website further notes that "[t]he members of the CLI, together with other participating companies participate in a quarterly statistical program to track manufacturer shipment data of Contact Lens and Lens Care products which is managed by Veris Consulting ['Veris'].   The program's objective is to provide participants with accurate and timely consolidated market data. . . . Each participating company in the CLI Statistical Program has a representative on the CLI Global Statistical Task Force."   According to Veris' website, the program established by it for the CLI "track[s] sales at a detailed level worldwide" and "is more valuable than other sources of market data because sales are reported directly from manufacturers[.]"  Veris states that its work for the CLI "is the only program where the data is reviewed annually by Veris to ensure accuracy.  Veris implemented this internal review process to reassure participants that they could be confident in the data."  Indeed, Veris requests that "the finance department at each manufacturer's headquarters . . . . [pull sales information and revenue data] directly from their internal system at the model, or SKU level."

138.    The resulting low margin of error "is extremely important to participants since they use this data for strategic planning" and is reported to the Manufacturer Defendants on a quarterly and annual basis.  According to its website, Karen Eftekari, the person at Veris who is the Senior Manager for this work, "also works with member companies [of CLI] such as Johnson & Johnson and Bausch & Lomb performing high-level data analysis and designing custom reporting tools and dashboards."  The CLI functions as one of the vehicles through which the Manufacturer Defendants collude to enforce and monitor their respective RPMs. The CLI price monitoring program allows the Manufacturer Defendants to keep their fellow manufacturers in line and prevents cheating.

### g.    ABB's and ECPs' Conduct

139.    The Manufacturer Defendants' close relationships with ECPs and with a principal ECP representative, Defendant ABB, enabled the Manufacturer Defendants to collude with the ECPs and ultimately with each other to develop the RPM policies.  As noted above, ABB has stated publicly that it "work[ed] closely with manufacturers to develop unilateral pricing policies."  Similarly, the Manufacturer Defendants have stated that they collaborated with ECPs to develop the policies.  J&J, for example, in its letter to ECPs announcing its RPM policy, stated that it developed the policy in response to ECP "feedback", that ECPs were "instrumental" in formulating J&J's policy, and that J&J's implementation of that policy "further demonstrates our commitment to [ECPs]."  As also noted above, CV has admitted that it decided to use an RPM policy on its Clariti line of contact lenses in direct response to feedback from Independent ECPs. During this collusive process, on information and belief, ABB and the ECPs communicated to each Manufacturer Defendant its competitors' position on RPM policies.

h.    **Past Conspiratorial Conduct**

140.    The Manufacturer Defendants and Independent ECPs have also demonstrated a past propensity to conspire against discounting retailers of contact lenses, as reflected in the discussion above of the First Contact Lens Litigation.

## VII.   HARM TO COMPETITION

141.    Plaintiffs allege horizontal and vertical conspiracies in violation of federal and state law.  Two sets of horizontal competitors conspired to fix prices: (1) the Manufacturer Defendants agreed to implement common RPM agreements, rather than compete for the business of discount retailers and wholesalers; and (2) ECPs and ABB agreed to pressure the Manufacturer Defendants to enter into common RPM agreements to fix the retail prices of contact lenses.  Further, each RPM agreement reflects a vertical agreement up and down the entire distribution chain for the relevant range of contact lenses included.  Combined, these horizontal and vertical price-fixing arrangements created a profound anticompetitive effect that harmed consumers by increasing prices of contact lenses.

142.    Defendants' agreement to collectively implement RPM policies has harmed and continues to harm competition by increasing prices for the contact lenses made subject to them. Consumers ultimately pay the economic cost of this wrongful conduct in the form of higher prices for contact lenses affected by UPPs.  As Costco itself alleges in its action against J&J, the unlawful RPM agreements at issue "resulted in substantially higher prices[.]"  (Emphasis added.)

143.    Each RPM agreement is independently anticompetitive, and the anticompetitive effects were cumulative.  That is, while an RPM policy regarding a single brand eliminated intrabrand and intertype competition, nearly identical RPM policies among all major manufacturers eliminated interbrand competition as well.

144.   At the Senate Hearing, Zeidner presented the following graphic showing a range of a 40% to 112% difference between the lowest internet price for J&J's affected products and its UPP price.



145.   George Slover, Senior Policy Counsel for the Consumers' Union, and Atkinson gave similar testimony at the Senate Hearing.

146.   Zeidner noted that as of July 2014, RPM policies encompassed 40% of the market and predicted 80% coverage by the end of 2015, especially with ECPs writing prescriptions for contact lenses subject to the policy.  As noted above, since his testimony at the Senate Hearing, CV adopted an RPM policy on one of its contact lens lines.

147.   Similar testimony was given by Jay Maguire, the Vice-President of Governmental Affairs for 1-800-Contacts, at the aforementioned February 17, 2015 hearing before the Utah Senate Business & Labor Committee.  He noted that because of J&J's adoption of UPPs, 1-800-Contacts was compelled to eliminate rebates of between $15 and $100 on numerous J&J

41

ACUVUE® products.  The result was that it effectively was forced to raise prices on the vast majority of the contact lenses it sells that are subject to UPPs.  In a January 24, 2015 article, Oregonlive.com corroborated this point with a real-world example, noting how 1-800-Contacts sold a 90-lens box of J&J ACUVUE® MOIST® contact lenses a year ago at a price as low as $57.49, but the same product is now sold for $63.74.  In his aforementioned testimony, Maguire noted that a survey of 780 doctors conducted by 1-800-Contacts both before and after J&J's implementation of UPPs confirmed that prices for J&J contact lenses subject to such UPPs increased by 57% when compared to pre-UPP levels.

148.    Similarly, the website stoppupp.org has published this comparison of J&J's December 2013 contact lens prices (accounting for rebates and mail-in coupons) and its post-UPP prices:

**stoppupp.org Data**

| Manufacturer | Contact Lens | Old Price | UPP Price | Change |
|---|---|---|---|---|
| **Johnson & Johnson** | 1-Day Acuvue Moist (30 lenses) | $13.80 | $33.00 | **+139%** |
| **Johnson & Johnson** | 1-Day Acuvue Moist (90 lenses) | $36.49 | $63.50 | **+74%** |
| **Johnson & Johnson** | 1-Day Acuvue Moist for Astigmatism (30 lenses) | $18.24 | $34.50 | **+89%** |
| **Johnson & Johnson** | 1-Day Acuvue Trueye (90 lenses) | $47.74 | $82.50 | **+73%** |
| **Johnson & Johnson** | Acuvue Oasys with Hydraclear Plus (12 lenses) | $22.68 | $67.50 | **+198%** |
| **Johnson & Johnson** | Acuvue Oasys with Hydraclear Plus (24 lenses) | $44.23 | $110.00 | **+149%** |
| **Johnson & Johnson** | Acuvue Oasys for Astigmatism (6 lenses) | $21.74 | $40.00 | **+84%** |
| **Johnson & Johnson** | Acuvue Oasys for Presbyopia (6 lenses) | $22.96 | $40.00 | **+74%** |

149.    The effect of UPPs is reflected on the websites of internet retailers of contact lenses.  In response to the questions about why it no longer beats the prices of others for contact lenses by 2% and why it charges the same as doctors, 1-800-Contacts' website states:

> We have always stood behind our commitment to beat any price by 2%. While we continue this practice on a large portion of our inventory, manufacturer mandated pricing policies have forced us to discontinue this pricing benefit.  We aren't allowed to lower the price or offer any kind of discounts or rebates on products affected by UPP. . . . The [UPP] created by manufacturers sets the minimum price that contacts can be sold for, which restricts our ability to offer a lower price than doctors on those lenses.

150.    Similarly, the website of LensDiscounters.com has this to say about RPM policies:

> UPP (Unilateral Pricing Policy) is a strategy used by certain contact lens manufacturers, requiring retailers such as ourselves to price their products at a manufacturer's specified minimum price. Retailers who do not comply will no longer be supplied by the manufacturer. . . . Under the guise of price equality, manufacturers want to give eye care practitioners incentive to prescribe their products vs. their competitor's products on the basis that the patient will be more likely to buy directly from the doctor if the prices for that contact lens are the same online or elsewhere.  Initially, this might seem like a fair practice, but it prevents free market pricing—and in the end, results in higher pricing to you, the end consumer. . . . At LensDiscounters.com, we strive to provide a fair and transparent shopping experience to all of our customers and do not believe price controls are in the best interest of our customers.  We will do what we can to fight these pricing policies and keep eyecare affordable for our customers.  We will continue to keep you informed and will have more information about UPP soon.

151.    Likewise, 1-800-GET-LENS told its customers that "Bausch & Lomb has implemented a Unilateral Pricing Policy (UPP) on all retailers, both online and bricks and mortar. The UPP prevents anyone from selling Bausch & Lomb products below a certain price." A representative for Costco testified before the Washington Senate Health Care Committee on February 16, 2015 that the Manufacturer Defendants' implementation of RPM policies has caused it to raise prices on affected contact lenses by as much as 35%.

43

152.    In mid-2014, Costco conducted an analysis of its prices for Alcon's DAILIES TOTAL1 contact lenses before and after Alcon implemented RPM.  It concluded that the price for a 90-lens pack increased from $85.00 to $95.00.  It also examined J&J prices, and concluded that J&J's RPM policy required Costco to raise its prices an average of 26%.  Costco makes similar allegations in the Costco action.

153.    Gerber, in his article quoted above, also confirms that UPPs have the effect of elevating contact lens prices.  Indeed, at a January 29, 2015 hearing before the Mississippi Senate Public Health & Welfare Committee, 1-800-Contacts presented econometric evidence that the use of RPM policies going forward could cost contact lens consumers as much as $2 billion annually. Defendants' conspiracy has thus caused Plaintiffs and members of the Class to pay supracompetitive prices for contact lenses and has substantially eliminated price competition in the market.

154.    As a direct and proximate result of Defendants' unlawful agreements and overt acts taken in furtherance thereof, Plaintiff and members of the Class have paid more for contact lenses than they otherwise would have paid, and Defendants have received more for contact lenses than they otherwise would have received.  Plaintiffs and members of the Class will continue to make supracompetitive payments for contact lenses, and Defendants will continue to receive ill-gotten gains if the unlawful agreements and overt acts are allowed to continue unabated.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE
### Per Se Violation of the Sherman Antitrust Act:
### Horizontal Price Fixing

155.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

156.    The following horizontal conspiracies are each per se violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1: (1) an agreement among the Manufacturing Defendants to implement RPM agreements; and (2) an agreement among ECPs and ABB to pressure the Manufacturer Defendants to enter into common RPM agreements to fix the retail prices of contact lenses.

157.    In addition, both sets of horizontal conspirators knew and understood of each other's agreements and efforts, and collectively worked in concert with a conscious commitment to a single common scheme designed to achieve an unlawful objective: to eliminate interbrand, intertype, and intrabrand competition for contact lenses and fix retail prices at the highest levels possible.

158.    Beginning in June of 2013 and continuing to the present, Defendants have engaged in a conspiracy and agreement in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).  The Manufacturer Defendants implemented RPM policies in concert with each other and with Independent ECPs, acting, in part, through Defendant ABB, which was complicit in their implementation.  Non-ECP vendors of contact lenses are coerced into abiding by the RPM agreements or suffer the loss of the ability to sell the products covered by them.  The Manufacturer Defendants agreed among themselves to start using RPM policies, recognizing that the policies could be enforced only if all of them implemented them.  The Manufacturer Defendants also conspired with Defendant ABB and with Independent ECPs to implement the RPM agreements.

159.    Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially

45

fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of contact lenses.

160.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

161.   Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT TWO
### Rule of Reason Violation of the Sherman Antitrust Act:
### Resale Price Maintenance

162.   Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

163.   Defendants' UPP polices alleged herein each are unlawful minimum resale price agreements and unreasonable restraints of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

164.   Each of the UPP policies are unreasonable restraints of trade.

165.   First, all four Manufacturing Defendants have RPM programs: Alcon, J&J, CV, and B+L all have adopted RPM policies.

166.   Second, the Manufacturer Defendants collectively control 97% of the domestic contact lens market.  Independent ECPs also prescribe the majority of contact lenses sold in the United States.

167.   Third, Independent ECPs and ABB played a significant role in instigating manufacturers to adopt RPM policies. ABB worked with all four Manufacturer Defendants to

46

impose the RPM policies. As the dominant distributor in the market, ABB has the power to foreclose price competition. In addition, J&J stated that it developed its RPM policy after listening to ECPs' "feedback" and they were "instrumental" in the creation of that policy. CV has also admitted as much.

168.    Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of contact lenses.

169.    There is no legitimate business justification for, or procompetitive benefits caused by Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

170.    A severe (and intentional) anticompetitive effect of Defendants' UPP is to stifle intertype competition—the competition between different kinds of retailers.  Experience teaches that new types of retailers enter the market as low-cost alternatives to traditional retailers, passing their inherent cost-savings on to consumers by cutting prices and often offering more convenient service.  This had been true in contact lenses until Defendants stopped it with UPP.

171.    By stifling price competition and consumer choice, UPP has erected an anticompetitive barrier to entry for non-traditional optical retailers and has denied consumers the benefits of the efficiencies that such potential new entrants have and would pass on, as well as blunted the disciplining effect that such competition had and would continue to have on both the entrenched ECPs and the Manufacturing Defendants.

172.    Until UPP took hold, new retail alternatives to the too-often conflicted ECP dealers had emerged in the form of "big box" department stores, warehouse clubs, and online

47

retailers, providing potent competition to ECPs—and lower prices to consumers.   With Defendants' UPP in place, the opportunities and incentives for these recent entrants—such as Target, Costco and 1-800-CONTACTS—to provide their innovative, low cost retail solutions in the sales of contact lens to consumers has been, and increasingly is being, eliminated by UPP.

173.   UPP, by fixing prices levels and preventing low-price competition, has erected a potentially insurmountable barrier to entry for low-price retail innovators.  History is repeating itself; the traditional proponents of RPM have always sought, as here, to protect existing retailers from more efficient dealers.

174.   Plaintiff and members of the Class have been and are being denied the benefits of the innovations in distribution made possible by robust intertype competition.  By impeding the ability of dynamic new entrants to pass along efficiency gains to customers, UPP has eliminated and continues to eliminate important free market forces to the detriment of Plaintiff and members of the Class, who have paid, and are paying, higher prices for contacts lenses as a direct, intended, and proximately result of Defendants' restraints of trade.

175.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

176.   Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT THREE**
**Per Se Violation of the New Jersey Antitrust Act:**
**Horizontal Price Fixing**

177.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

178.    The following horizontal conspiracies are each per se violations of the New Jersey Antitrust Act, N.J.S.A. § 56-9-3: (1) an agreement among the Manufacturing Defendants to implement RPM agreements; and (2) an agreement among ECPs and ABB to pressure the Manufacturer Defendants to enter into common RPM agreements to fix the retail prices of contact lenses.

179.    Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of contact lenses.

180.    Plaintiff and members of the Class have been injured in their business and property by reasons of the violations of the New Jersey Antitrust Act within the meaning of N.J. Stat. § 56:9-12.

181.    Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violations of New Jersey Antitrust Act.

**COUNT FOUR**
**Violation of the New Jersey Antitrust Act:**
**Resale Price Maintenance**

182.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

49

183.    Defendants' RPM agreements alleged herein are each per se violations of the New Jersey Antitrust Act, N.J.S.A. § 56:9-1, *et seq*.  RPM is contrary to the public policy of the State of New Jersey as expressed in N.J.S.A. § 56:4-1.1, which provides: "Any contract provision that purports to restrain a vendee of a commodity from reselling such commodity at less than the price stipulated by the vendor or producer shall not be enforceable or actionable at law."

184.    Defendants intended to and actually did restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the price of contact lenses.

185.    Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of the New Jersey Antitrust Act.  There is no legitimate business justification for, or procompetitive benefits caused by Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

186.    Plaintiff and members of the Class have been injured in their business and property by reasons of the violations of the New Jersey Antitrust Act and seek treble damages and other relief under N.J.S.A. § 56:9-12.  Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violations of New Jersey Antitrust Act and seek declaratory and injunctive relief under N.J. Stat. § 56:9-12.

## COUNT FIVE
### Violation of the New Jersey Consumer Fraud Act

187.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

188.   Contact lenses purchased by Plaintiffs and members of the Class are "merchandise" with the meaning of the New Jersey Consumer Fraud Act ("FCA"), under N.J.S.A. § 56:8-1(c), which provides in pertinent part that the "term 'merchandise' shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."

189.   With respect to contact lenses, Defendants engaged in unlawful conduct; Plaintiff and members of the Class suffered ascertainable loss; and there is a causal relationship between the unlawful conduct and the ascertainable loss within the meaning of the CFA.

190.   Defendants' policies, acts, and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes at supracompetitive prices under false pretenses, and violated and continue to violate the following sections of the FCA, which prohibits, in connection with the sale or advertisement of merchandise, the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact.

191.   Plaintiff and members of the Class have paid more for contact lenses than they otherwise would have paid, and Defendants have received more for contact lenses than they otherwise would have received.  Plaintiffs and members of the Class will continue to make supracompetitive payments for contact lenses, and Defendants will continue to receive ill-gotten gains if the unlawful agreements and overt acts are allowed to continue unabated.

192.   RPM is contrary to the public policy of the State of New Jersey not only in that it violates the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act, but also under N.J.S.A. § 56:4-1.1, which provides: "Any contract provision that purports to

restrain a vendee of a commodity from reselling such commodity at less than the price stipulated by the vendor or producer shall not be enforceable or actionable at law."

193.    Plaintiff and members of the Class suffered ascertainable losses of money as a result of Defendants' unlawful methods, acts, and practices alleged herein, entitling Plaintiff and members of the Class to treble damages, attorney fees, and costs of suit, in addition to any other appropriate legal or equitable relief from Defendants under N.J.S.A. § 56:8-19.

194.    Plaintiffs also seek full consideration damages.   Under N.J.S.A. § 56:8-2.11, Defendants are liable to Plaintiffs and members of the Class for a full refund of all moneys acquired by means of the unlawful practices alleged herein.

## COUNT SIX
### Unjust Enrichment

195.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

196.    Defendants were enriched at the expense of Plaintiffs and the members of the Class under such circumstances that equity and good conscience demand that Defendants not retain what is sought to be recovered.

197.    Defendants' enrichment resulting from RPM is contrary to the public policy of the State of New Jersey not only in that it violates the Sherman Act, the New Jersey Antitrust Act, and the New Jersey Consumer Fraud Act, but also under N.J.S.A. § 56:4-1.1, which provides: "Any contract provision that purports to restrain a vendee of a commodity from reselling such commodity at less than the price stipulated by the vendor or producer shall not be enforceable or actionable at law."

198.    Plaintiff and members of the Class have paid more for contact lenses than they otherwise would have paid, and Defendants have received more for contact lenses than they otherwise would have received, as a result of the foregoing.

199.    Plaintiffs seek disgorgement and restitution of Defendants' ill-gotten gains.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays that the Court Order, Adjudge, and Decree:

A.    That this action may be maintained as a Class Action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) & (3), and direct that Reasonable Notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class and declare Plaintiff to be a Class Representative, and the undersigned counsel to be Lead Class Counsel under Rule 23(g) of the Federal Rules of Civil Procedure for the Class.

B.    That Defendants violated Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and enters joint and several judgments against Defendants in favor of Plaintiff and the Class.

C.    That Defendants violated the New Jersey Antitrust Act, N.J.S.A. § 56:9-1, *et seq*., and enters joint and several judgments against Defendants.

D.    That Defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq*., and enters joint and several judgments against Defendants.

E.    That Defendants were unjustly enriched at the expense of Plaintiff and members of the Class.

F.    That Plaintiff and members of Class be awarded three times actual damages suffered by reason of Defendants' violations of law.

G.    That Plaintiff and members of Class be awarded full consideration damages.

53

H.    That Plaintiff and members of Class be awarded reasonable costs of suit, including expert fees and costs.

I.    That Plaintiff and members of Class be awarded pre- and post-judgment interest.

J.    That Plaintiff and members of Class be awarded reasonable attorneys' fees.

K.    That Defendants' agreements be declared void at law.

L.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy, or agreement alleged herein, including entering into, abiding by, promoting, or enforcing UPPs;

M.    That Defendants be made to disgorge their ill-gotten gains to Plaintiff and members of the Class; and

N.    That Plaintiff and members of the Class be granted all such other, further and different relief as is just and proper.

Dated: March 27, 2015.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
      JAMES E. CECCHI

*Of counsel:*

Michael E. Criden
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, Florida 33143
(305) 357-9000

X.    **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury as to all issues so triable.

Dated: March 27, 2015.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:    /s/ James E. Cecchi
        JAMES E. CECCHI

*Of counsel:*

Michael E. Criden
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Suite 515
South Miami, Florida 33143
(305) 357-9000